IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JASON M. COX, *et al.*,          *

    Plaintiffs,              *

vs.                              *

                           CASE NO. 4:11-cv-177 (CDL)

COMMUNITY LOANS OF AMERICA,      *
INC., *et al.*,
                           *

    Defendants.              *

_____  *

## O R D E R

This putative class action involves vehicle title pawns.[1] Plaintiffs Jason M. Cox, Estevan Castillo and Leo Thomas Tookes Jr. (collectively, "Plaintiffs") are members of the United States Military who entered vehicle title pawn transactions with one of the Defendants and were later unable to redeem their car titles. Plaintiffs' vehicles have either been repossessed or are subject to repossession. Plaintiffs allege that their vehicle title pawn transactions are void from the inception because they are prohibited by the federal Military Lending Act ("MLA"), 10 U.S.C. § 987. Defendants Community Loans of America, Inc., Alabama Title Loans, Inc. and Georgia Auto Pawn, Inc. (collectively, "Defendants") filed a Motion to Dismiss (ECF No. 32) relying on an arbitration clause in the relevant

---

[1] Plaintiffs refer to the transactions as "vehicle title loans." Defendants refer to the transactions as "vehicle title pawns."

contracts.   Defendants maintain that the arbitration clauses are enforceable and the transactions do not violate the MLA.   As the Court announced during the hearing on the motion, Defendants' motion is denied.   This Order sets forth the reasons for the ruling.

The Court also observes that Plaintiffs have filed a Motion for Preliminary Injunction (ECF No. 20), seeking preliminary injunctive relief for the named Plaintiffs and all potential members of the putative class.   Defendants have agreed to refrain from taking action against the named Plaintiffs and have represented that they will not repossess the vehicles of Castillo and Tookes during the pendency of this litigation.[2] Plaintiffs' Motion for Preliminary Injunction (ECF No. 20) is therefore granted as to the named Plaintiffs.   Plaintiffs have withdrawn their request for a preliminary injunction as to absent putative class members, so the Motion for Preliminary Injunction is denied as to the absent putative class members.

MOTION TO DISMISS STANDARD

In seeking dismissal of Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants argue that Plaintiffs' claims must be arbitrated as a matter of law based on a facial examination of the Complaint.   When considering a 12(b)(6) motion to dismiss, the Court must accept as true all

---

[2] Cox's vehicle has already been repossessed and resold.

facts set forth in the plaintiff's complaint and limit its consideration to the pleadings and exhibits attached thereto. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, ___ 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

In the present context, the Court must determine whether Plaintiffs have sufficiently alleged that their title pawn transactions violated the MLA, and thus the arbitration clauses in their agreements are unenforceable. Defendants argue that the transactions in question involve Plaintiffs actually selling their vehicles to Defendants while retaining the right to re-purchase them by paying back the sale price plus a fee that is a percentage of the sale price. Defendants maintain that such title pawn transactions are not consumer credit transactions within the meaning of the MLA, and therefore, are not prohibited by the MLA. Plaintiffs contend that the transactions are loans that are secured by the titles to their vehicles, and as such, are prohibited consumer credit transactions under the MLA. At this stage of the proceedings, the Court examines Plaintiffs' factual allegations in the Complaint along with any exhibits to

the Complaint.     Construing all reasonable inferences in Plaintiffs' favor, the Court must determine whether Plaintiffs have sufficiently alleged that the transactions are credit transactions prohibited by the MLA.

FACTUAL ALLEGATIONS

The Plaintiffs allege the following in their Complaint. Plaintiffs are members of the United States military.    Am. Compl. ¶¶ 3-5, ECF No. 18.    Defendants are businesses that make vehicle title loans.    *Id.* ¶¶ 7, 10, 13.    A vehicle title loan is a transaction in which the customer pledges or signs over his car title to a vehicle title loan company, and in return the customer receives cash.    The customer gets his car title back if he pays the loan amount plus a percentage within a certain number of days.    Each Plaintiff obtained a vehicle title loan from one of the Defendants.

## I.   Plaintiff Jason Cox

Plaintiff Jason Cox, a staff sergeant in the U.S. Army, obtained a vehicle title loan on his 2002 Dodge Durango from Defendant Alabama Title Loans, Inc. ("Alabama Title Loans") in Phenix City, Alabama.    *Id.* ¶¶ 33, 35.    In entering the loan, Cox presented his military ID.    *Id.* ¶ 34.    The principal amount of the loan was $3,000.00, and it was repayable in thirty days. *Id.* ¶ 33; *accord* Am. Compl. Ex. C at 1, Cox Pawn Agreement & Disclosure 1, ECF No. 18-1 at 14 [hereinafter Cox Pawn

Agreement].   The annual percentage rate for the loan was 146%.
Am. Compl. ¶ 36; Cox Pawn Agreement 1.   As a condition of the
loan, Cox relinquished the title to his truck.   Am. Compl. ¶ 35.

Cox's pawn agreement stated that Cox was "pledging" the
title to his Dodge Durango to Alabama Title Loans "on the
condition that it may be redeemed for a fixed price within a
stated period of time."   Cox Pawn Agreement 1.   Cox agreed "to
execute all documents necessary and appropriate to record
[Alabama Title Loans'] lien on the Certificate of Title."   *Id.*
The agreement stated that Cox was "giving a security interest in
the certificate of title" to the Dodge Durango, and it contained
certain disclosures required under the federal Truth in Lending
Act, 15 U.S.C. § 1601 *et seq*.   ("TILA"), including the "annual
percentage rate" ("The cost of your credit as a yearly rate"),
the "finance charge" ("The dollar amount the credit will cost
you"), and the "amount financed" ("The amount of credit provided
to you").   *Id.*   The pawn agreement also contained an arbitration
provision.   *Id.* at 2.

Cox's loan was "rolled over, renewed and/or refinanced"
multiple times.   Am. Compl. ¶ 37.   Cox received a "Reminder to
Pledgor," which stated that his "automobile title has been
pledged as security for the pawn."   Am. Compl. Ex C at 11,
Reminder to Pledgor, ECF No. 18-1 at 24.   The Reminder stated
that the title pawn "is a more expensive way of borrowing money"

and asked Cox to acknowledge that he "borrowed" a certain sum that he would need to repay in order to redeem the certificate of title on his truck. *Id.* The Reminder also asked Cox to acknowledge that if he did not pay the amount due, he would be "placing continued ownership of [his] automobile at risk." *Id.* After nearly a year of "rolling over" the vehicle title loan, Cox could not afford to pay the balance due to redeem the title and could not afford the interest and finance payment required to roll over the loan again. Am. Compl. ¶¶ 42-43. The Dodge Durango was repossessed from Cox's home at Ft. Benning, Georgia. *Id.* ¶¶ 45-47.

## II.  Plaintiff Estevan Castillo

Plaintiff Estevan Castillo, a master sergeant in the U.S. Army, obtained a vehicle title loan on his 1994 Chevrolet Camaro from Defendant Georgia Auto Pawn, Inc. ("Georgia Auto Pawn") on Victory Drive in Columbus, Georgia. Am. Compl. ¶¶ 49, 52. In entering the loan, Castillo presented his military ID and his deployment orders. *Id.* ¶ 50. The principal amount of the loan was $600.00, and it was repayable in thirty days. *Id.* ¶ 49; *accord* Am. Compl. Ex. D at 1, Castillo Motor Vehicle Pawn Agreement & Disclosure/Receipt 1, ECF No. 18-1 at 39 [hereinafter Castillo Pawn Agreement]. The annual percentage rate for the loan was 152%. Am. Compl. ¶ 53; Castillo Pawn

Agreement 1.  As a condition of the loan, Castillo relinquished the title to his car.  Am. Compl. ¶ 52.

Castillo's pawn agreement stated that Georgia Auto Pawn was "purchasing" the title to Castillo's Camaro, "on the condition that it may be redeemed for a fixed price within a stated period of time."  Castillo Pawn Agreement 1.  Georgia Auto Pawn notified Castillo that it may charge him a fee "to register a lien upon the certificate of title."  *Id.*  The agreement stated that Castillo was "giving a security interest" in the the Camaro, and it contained certain disclosures required under TILA, including the "annual percentage rate" ("The cost of your credit as a yearly rate"), the "finance charge" ("The dollar amount the credit will cost you"), and the "amount financed" ("The amount of credit provided to you").  *Id.*  The pawn agreement also contained an arbitration provision.  *Id.* at 2.

Castillo's loan was "deferred, rolled over, renewed and/or refinanced" multiple times.  Am. Compl. ¶ 54.  Castillo received a "Reminder to Pledgor," which stated that his "automobile title has been pledged as security for the pawn."  Am. Compl. Ex. D at 4, Reminder to Pledgor, ECF No. 18-1 at 42.  The Reminder stated that the title pawn "is a more expensive way of borrowing money" and asked Castillo to acknowledge that he "borrowed" a certain sum that he would need to repay in order to redeem the certificate of title on his car.  *Id.*  The Reminder also asked

Castillo to acknowledge that if he did not pay the amount due,
he would be "placing continued ownership of [his] automobile at
risk." *Id.* After approximately a year of "rolling over" the
vehicle title loan, Castillo could not afford to pay the balance
due to redeem the title and could not afford the interest and
finance payment required to roll over the loan again. Am.
Compl. ¶¶ 59-60. Defendants have threatened repossession of the
Camaro. *Id.* ¶ 61.

**III. Plaintiff Leo Thomas Tookes, Jr.**

Plaintiff Leo Thomas Tookes, Jr., a sergeant in the U.S.
Marines, obtained a vehicle title loan on his 1999 Jeep Grand
Cherokee from Georgia Auto Pawn at its location in Kingsland,
Georgia. Am. Compl. ¶ 63, 65. Tookes had previously obtained a
vehicle title loan from Georgia Auto Pawn; in entering the prior
loan, Tookes presented his military ID. *Id.* ¶¶ 63-64. The
principal amount of the second loan was $2,000.00, and it was
repayable in thirty days. *Id.* ¶ 68; *accord* Am. Compl. Ex. E at
4, Tookes Motor Vehicle Pawn Agreement & Disclosure/Receipt 1,
ECF No. 18-1 at 47 [hereinafter Tookes Pawn Agreement]. The
annual percentage rate for the loan was 152%. Am. Compl. ¶ 71;
Tookes Pawn Agreement 1. As a condition of the loan, Tookes
relinquished the title to his car. Am. Compl. ¶ 70.

Tookes's pawn agreement stated that Georgia Auto Pawn was
"purchasing" the title to Tookes's Jeep, "on the condition that

it may be redeemed for a fixed price within a stated period of time." Tookes Pawn Agreement 1. Georgia Auto Pawn notified Tookes that it may charge him a fee "to register a lien upon the certificate of title." *Id.* The agreement stated that Tookes was "giving a security interest" in the Jeep, and it contained certain disclosures required under TILA, including the "annual percentage rate" ("The cost of your credit as a yearly rate"), the "finance charge" ("The dollar amount the credit will cost you"), and the "amount financed" ("The amount of credit provided to you"). *Id.* The pawn agreement also contained an arbitration provision. *Id.* at 2.

Tookes's loan was "deferred[,] rolled over, renewed and/or refinanced" multiple times. Am. Compl. ¶ 72. After nearly a year of "rolling over" the vehicle title loan, Tookes could not afford to pay the balance due to redeem the title and could not afford the interest and finance payment required to roll over the loan again, which means that the Jeep is subject to the possibility of repossession. Am. Compl. ¶¶ 77-79.

DISCUSSION

The central issue in this case is whether Plaintiffs have adequately alleged violations of the Military Lending Act ("MLA"), 10 U.S.C. § 987.[3] It is undisputed that if the MLA

---

[3] The "Military Lending Act" is the common name for the John Warner National Defense Authorization Act for Fiscal Year 2007 § 670,

applies, then the arbitration provisions in the relevant contracts are unenforceable, 10 U.S.C. § 987(e)(3), and the Motion to Dismiss based on the arbitration provision must be denied.

## I.   Military Lending Act Background

In 2006, the U.S. Department of Defense issued a report to Congress entitled "Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents" ("DoD Report"). http://www.defense.gov/pubs/pdfs/report_to_congress_final.pdf (last visited Mar. 5, 2012). The report focused on "predatory lending" to military personnel, including car title loans. *Id.* at 4. The report concluded that predatory lending to military personnel, including car title loans, "undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." *Id.* at 9. The report recommends prohibiting lenders from using "car title pawns as security for obligations." *Id.* at 7, 51. The report also notes a steady and significant increase in the rate of revoked or denied security clearances for military personnel due to financial problems; "At a time when we are at war, this is an unacceptable loss of valuable talent and resources." *Id.* at 87.

---

Limitations on Terms of Consumer Credit Extended to Servicemembers and Dependents, Pub. L. 109-364, 120 Stat. 2083, 2266, codified at 10 U.S.C. § 987.

In response to the DoD Report, Congress enacted the MLA. The MLA provides that a "creditor who extends consumer credit" to a "covered member of the armed services" "may not impose an annual percentage rate of interest greater than 36 percent" with respect to the credit extended. 10 U.S.C. § 987(a), (b). The MLA also makes it unlawful for a "creditor to extend consumer credit to a covered member . . . with respect to which" the creditor uses "the title of a vehicle as security for the obligation." 10 U.S.C. § 987(e)(5).

The MLA requires certain mandatory disclosures in connection with the "extension of consumer credit." 10 U.S.C. § 987(c). The MLA expressly preempts inconsistent state or federal laws. 10 U.S.C. § 987(d). As noted above, Defendants concede that if the MLA applies to the transactions at issue in this case, then the arbitration clauses in the relevant agreements are unenforceable. *See* 10 U.S.C. § 987(e)(3) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor requires the borrower to submit to arbitration[.]"). If a "creditor" knowingly violates the MLA, that is a misdemeanor. 10 U.S.C. § 987(f)(1). Also, "[a]ny credit agreement, promissory note, or other contract prohibited under [the MLA] is void from the inception of such contract." 10 U.S.C. § 987(f)(3).

11

The MLA does not define "creditor" or "consumer credit." Rather, the statute directed the Secretary of Defense to prescribe regulations establishing those definitions after consultation with the Department of Treasury, Office of the Comptroller of the Currency, Office of Thrift Supervision, Board of Governors of the Federal Reserve System, Federal Trade Commission, Federal Deposit Insurance Corporation, and the National Credit Union Administration. 10 U.S.C. § 987(h)(2)(D), (3). In the final rule adding new regulations to implement the provisions of the MLA, the Department of Defense stated that "vehicle title loans should be included within the definition of consumer credit, and that covering such transactions is consistent with the law's purpose." Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 Fed. Reg. 50,580, 50,586 (Aug. 31, 2007).

The regulations contain the following definitions:

"**Creditor**" is "a person who is engaged in the business of extending consumer credit with respect to a consumer credit transaction covered by this part." 32 C.F.R. § 232.3(e).

"**Credit**" is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(d).

"**Consumer credit**" is "closed-end credit offered or extended to a covered borrower primarily for personal, family or household

purposes" and *includes* "*vehicle title loans,*" which are defined as "Closed-end credit with a term of 181 days or fewer that is secured by the title to a motor vehicle, that has been registered for use on public roads and owned by a covered borrower" other than a "credit transaction to finance the purchase or lease of a motor vehicle when the credit is secured by the vehicle being purchased or leased."   32 C.F.R. § 232.3(b)(1)(ii), (b)(2)(ii) (emphasis added).

"**Closed-end credit**" is defined as "credit other than 'open-end credit' as that term is defined in Regulation Z (Truth in Lending), 12 CFR part 226."   32 C.F.R. § 232.3(a).   This definition of "closed-end credit" is therefore identical to the definition of "closed-end credit" in Regulation Z, which defines "closed-end credit" as "consumer credit other than 'open-end credit' as defined in this section."   12 C.F.R. § 226.2(a)(10). "Open-end credit" is defined in Regulation Z as "consumer credit extended by a creditor under a plan in which: (i) The creditor reasonably contemplates repeated transactions; (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. § 226.2(a)(20).   The Federal Reserve Board promulgated

Official Staff Interpretations to Regulation Z and included "pawn transactions" as a type of closed-end credit transaction. 12 C.F.R. pt. 226, Supp. I, Subpt. C ¶ 17(c)(1)(18) (interpretation regarding 12 C.F.R. § 226.17(c)). "Pawn transactions" occur when, "in connection with an extension of credit, a consumer pledges or sells an item to a pawnbroker creditor in return for a sum of money and retains the right to redeem the item for a greater sum (the redemption price) within a specified period of time." *Id.* The Department of Defense specifically adopted the Federal Reserve Board's Official Staff Interpretations to Regulation Z. 32 C.F.R. § 232.3(i) (stating that "Regulation Z means any of the rules, regulations, or interpretations thereof, issued by the Board of Governors of the Federal Reserve System to implement the Truth in Lending Act, as amended, from time to time, including any interpretation or approval issued by an official or employee duly authorized by the Board of Governors of the Federal Reserve System to issue such interpretations or approvals.").

## II. Did Plaintiffs Allege "Vehicle Title Loans"?

The question for the Court is whether, taking the factual allegations in Plaintiffs' Complaint to be true and resolving all reasonable inferences in Plaintiffs' favor, Plaintiffs have alleged that the transactions they entered with Defendants are "vehicle title loans" within the meaning of the MLA. Based on

14

the allegations in the Complaint and the attachments to the Complaint, the Court concludes that they have.

Defendants contend that the transactions at issue here are not "vehicle title loans" within the meaning of the MLA because the transactions here are creatures of state law that do not involve "credit" within the meaning of the MLA.  Again, under the MLA, "credit" is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  32 C.F.R. § 232.3(d).  Defendants' main argument is that Plaintiffs did not take on "debt" because there is no promissory note or other form of promise to pay; rather, the transaction was actually a sale of a vehicle with the opportunity to buy it back and the right to continue to use the vehicle until the time for re-purchasing it expired.

Construing Defendants' own documents in Plaintiffs' favor, however, Plaintiffs have plausibly alleged consumer credit transactions within the meaning of the MLA.  First, the agreements state the "cost of [Plaintiffs'] credit," "[t]he dollar amount the credit will cost [Plaintiffs]," and the "amount of credit provided to [Plaintiffs]."  *E.g.,* Cox Pawn Agreement 1.  Second, the agreements state that Plaintiffs were "giving a security interest in the certificate of title" to their vehicles.  *E.g., id.*  Third, the agreements state that Defendants may register a lien on the certificate of title.

*E.g., id.*   Fourth, Cox and Castillo each received a notice reiterating that his "automobile title has been pledged as security for the pawn," stating that pawning "is a more expensive way of borrowing money," asking that he acknowledge the amount "borrowed," and asking him to acknowledge that "continued ownership of [his] automobile" would be "at risk" if the amount due was not paid.   *E.g.,* Am. Compl. Ex. C at 11, Reminder to Pledgor, ECF No. 18-1 at 24.

In other words, construing the factual allegations in the Complaint and the attached agreements in Plaintiffs' favor, each Plaintiff deposited his vehicle title with a Defendant as security for the payment of a debt.   Defendants' own documents state that Plaintiffs "borrowed" money.   Moreover, a specific sum of money is due by agreement, and if it is not paid, then the Plaintiff loses the title to his car and the car itself.   *Cf.* Black's Law Dictionary, Debt (9th ed. 2009) (defining "debt" as "[l]iability on a claim; a specific sum of money due by agreement or otherwise").   For all of these reasons, the Court concludes that Plaintiffs sufficiently alleged that the transactions they entered with Defendants are "vehicle title loans" within the meaning of the MLA.

Defendants focus on Georgia and Alabama law and repeatedly argue that the transactions in this case "are not loans."   Under the law of both states, a "pawn transaction" is defined as

16

either a "loan on the security of pledged goods" or a "purchase of pledged goods on the condition that the pledged goods may be redeemed or repurchased by the pledgor or seller for a fixed price within a fixed period of time." O.C.G.A. § 44-12-130(3); *accord* Ala. Code § 5-19A-2(3). Under Georgia law, a pledgor or seller "may" redeem or repurchase the pledged goods (the car title). O.C.G.A. § 44-12-130(3). Under Alabama law, a pledgor does not have any obligation to redeem the pledged goods—meaning the car title. Ala. Code § 5-19A-6. Defendants assert that because the pledgor does not incur any personal liability to repay the "money advanced" under the law of Georgia and Alabama, then "pawn transactions" in those states do not involve "credit" or "debt."

The express preemption clause in the MLA "preempts any State or Federal law, rule, or regulation, including any State usury law, to the extent that such law, rule, or regulation is inconsistent with this section[.]" 10 U.S.C. § 987(d)(1). Therefore, to the extent that Georgia or Alabama law conflicts with the MLA, the state law is preempted. Accordingly, it does not matter that Alabama and Georgia would categorize the transactions as "pawns" rather than "loans." What matters is that Plaintiffs sufficiently alleged that the transactions they entered with Defendants involve "credit" and are "vehicle title loans" within the meaning of the federal law. Thus, even though

17

the transactions may not be considered "credit" transactions under state law, they may be considered "consumer credit" transactions within the meaning of the MLA.

Defendants argue that even if the Court finds that Plaintiffs have sufficiently alleged claims under the MLA, the law is so vague and ambiguous that Defendants did not have notice that "pawn transactions" like the ones alleged in Plaintiffs' Complaint were covered under the MLA. Construing the factual allegations in the Complaint and the attachments to the Complaint in Plaintiffs' favor, however, Defendants did have notice that the transactions would be covered under the MLA. As discussed above, Defendants' own documents reference the "credit" provided to the Plaintiffs and state that Plaintiffs were "giving a security interest in the certificate of title" to their vehicles. *E.g.,* Cox Pawn Agreement 1. Also, Defendants appear to acknowledge that the "pawn transactions" are a type of "closed-end credit transaction" within the meaning of the TILA, which has the same definition of "closed-end credit transaction" as the MLA.

Defendants note that the Federal Reserve Board included "pawn transactions" as a type of closed-end credit transaction in its Official Staff Interpretations to Regulation Z, 12 C.F.R. pt. 226, Supp. I, Subpt. C ¶ 17(c)(1)(18). Indeed, Defendants assert that they included TILA disclosures in the

relevant agreements because they believed the transactions were "closed-end credit" transactions within the meaning of TILA. Defendants contend, however, that because the Department of Defense did not specifically adopt Regulation Z's definition of "closed-end credit" (rather, it *copied* Regulation Z's definition of "closed-end credit" and referred to Regulation Z for the definition of "open-end credit"), the Court should ignore the Official Staff Interpretation to Regulation Z for purposes of deciding the definition of a "closed-end credit" transaction under the MLA. As discussed above, however, the Department of Defense specifically adopted the Federal Reserve Board's Official Staff Interpretations to Regulation Z. 32 C.F.R. § 232.3(i).

Even if the Court were to ignore the fact that the Federal Reserve Board included "pawn transactions" as a type of closed-end credit transaction, there are other factors giving Defendants notice that the transactions alleged in the Complaint would be covered under the MLA. The Department of Defense included "vehicle title loans" in the definition of "consumer credit." 32 C.F.R. § 232.3(b)(1)(ii). The final rule adding new regulations to implement the provisions of the MLA discusses the "debt trap" created by "vehicle title loans" and observes that "[i]n many states these loans can be rolled over by the borrower several times if the borrower is unable to pay the principal and

interest when due. If not paid or rolled over, many states allow the creditor to repossess the vehicle and in some states the borrower is not entitled to any portion of the proceeds of the vehicle sale." 72 Fed. Reg. at 50,582. The rule goes on to observe that "vehicle title loans" contribute to a "cycle-of-debt" that is a significant concern to the Department of Defense. *Id.* The Department of Defense stated that "vehicle title loans should be included within the definition of consumer credit, and that covering such transactions is consistent with the law's purpose" and made it clear that its goal was to offer "protections from high-cost, short-term vehicle title loans." *Id.* at 50,586. For all of these reasons, construing the factual allegations in the Complaint and the attachments to the Complaint in Plaintiffs' favor, the Court concludes that the MLA is not ambiguous as to whether it covers the transactions alleged in the Complaint.

Given that Plaintiffs sufficiently alleged claims under the MLA, the arbitration provisions in their agreements are unenforceable. 10 U.S.C. § 987(e)(3). Accordingly, Defendants' Motion to Dismiss based on the arbitration provisions must be denied.

CONCLUSION

For the reasons explained in this Order, Defendants' Motion to Dismiss (ECF No. 32) is denied. Plaintiffs' Motion for

20

Preliminary Injunction (ECF No. 20) is granted as to the named Plaintiffs.   Plaintiffs have withdrawn their request for a preliminary injunction as to absent putative class members, so the Motion for Preliminary Injunction is denied as to the absent putative class members.

IT IS SO ORDERED, this 8th day of March, 2012.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE