IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JASON M. COX, *et al.*,          *

     Plaintiffs,          *

vs.          *          CASE NO. 4:11-CV-177 (CDL)

COMMUNITY LOANS OF AMERICA,          *
INC., *et al.*,
               *

     Defendants.
_____          *

O R D E R

Plaintiffs seek to represent a class of active duty military service members and their dependents in a class action against several vehicle title loan companies based on the companies' alleged violation of the Military Lending Act ("MLA"), 10 U.S.C. § 987 (2006).[1]  After entering into the vehicle title loan transactions, Plaintiffs were unable to redeem their car titles, and their vehicles were either repossessed or subject to repossession.  Plaintiffs maintain that these vehicle title loan transactions are prohibited by the

---

[1] The "Military Lending Act" is a common name for the John Warner National Defense Authorization Act for Fiscal Year 2007 § 670, Limitations on Terms of Consumer Credit Extended to Servicemembers and Dependents, Pub. L. No. 109-364, 120 Stat. 2083, 2266 (Oct. 17, 2006) (codified at 10 U.S.C. § 987_.  The MLA was amended effective January 2, 2013.  National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 662(a), Effect of Violations of Protections on Consumer Credit Extended to Members of the Armed Forces and their Dependents, 126 Stat. 1632, 1785-86 (Jan. 2, 2003) (codified at 10 U.S.C. § 987).  Plaintiffs' claims arose before that date, so the Court's references to the MLA are to the pre-2013 version unless otherwise noted.

MLA because the annual percentage rate of interest for each loan far exceeded the MLA's limit of thirty-six percent. Plaintiffs assert claims under the MLA, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state law.

Presently pending before the Court are Plaintiffs' motions for class certification seeking certification of their MLA and RICO claims under both Federal Rule of Civil Procedure 23(b)(2) (ECF No. 113) and Rule 23(b)(3) (ECF No. 191).[2] Defendants oppose certification, contending that Plaintiffs' claims lack merit and that Plaintiffs failed to satisfy the requirements of Rule 23. Specifically, Defendants argue that Plaintiffs' MLA claims fail as a matter of law because the applicable version of the MLA does not include a private right of action and because, even if it does, the transactions Plaintiffs entered with Defendants are not covered by the MLA. Defendants also maintain that Plaintiffs' RICO claims fail as a matter of law because no evidence exists in the present record supporting the essential elements for these claims. Defendants argue in the alternative that even if Plaintiffs' MLA and RICO claims are viable, a Rule 23(b)(2) class cannot be certified because Plaintiffs seek

---

[2] Plaintiffs initially sought certification of their MLA claims under Rule 23(b)(2) only. They later filed a motion to amend their Complaint to add a claim for certification under Rule 23(b)(3). That motion to amend (ECF No. 190) is granted.

damages that are not merely incidental to their claims for equitable relief.

As explained in the following discussion, the Court finds that a private right of action exists for violations of the MLA, so Defendants are not entitled to judgment as a matter of law on Plaintiffs' MLA claims.  The Court further finds, however, that the present record does not support Plaintiffs' RICO claims, and Defendants are entitled to judgment as a matter of law as to those claims.  Consequently, Plaintiffs' motion for class certification of the RICO claims is denied.  The Court also finds that Plaintiffs seek damages on their MLA claims that are not merely incidental to equitable relief, so Plaintiffs' MLA claims are not suitable for class certification pursuant to Rule 23(b)(2).  The Court does find that the certification of a Rule 23(b)(3) class is warranted to the extent explained in the remainder of this Order.

In Section I of this Order, the Court addresses Defendants' merits-based objections to class certification.  Section II addresses whether Plaintiffs' claims otherwise satisfy the certification requirements of Rules 23(b)(2) and 23(b)(3).

## I.  Defendants' Merits-Based Objections to Class Certification

Generally, class certification determinations should not be based on whether the plaintiffs will ultimately prevail on the merits.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133

S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); *see also Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013) (noting that rigorous analysis of class certification determination may involve "'considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action'") (quoting *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011). But in the present case, some merits-based issues are inextricably intertwined with Plaintiffs' class certification motions. Moreover, due to the nature of the issues presented by the motions for class certification, the Court, with the consent of the parties, permitted class certification discovery and some merits discovery to proceed simultaneously in an attempt to maximize judicial economy. This scheduling approach resulted in motions for class certification and summary judgment becoming ripe at the same time. Therefore, no party is prejudiced in any way by the Court's consideration of merits-based issues in its evaluation of class certification.

While these merits-based issues are relevant to class certification—because if Plaintiffs' claims lack merit, they

would not be certified for class treatment—these issues are actually presented through Defendants' motions for summary judgment.   Defendants first seek summary judgment as to Plaintiffs' MLA claims through a motion for partial summary judgment (ECF No. 139), arguing that the MLA does not include a private right of action.   Defendants filed a second motion for summary judgment (ECF No. 184), contending among other things that Plaintiffs' transactions are not covered by the MLA and that Plaintiffs' RICO claims fail as a matter of law.   The Court addresses the issues presented by these motions in turn.

A.   Does the Pre-2013 MLA Authorize a Private Right of Action?

As noted above, Defendants seek summary judgment as to Plaintiffs' MLA claims, contending that the applicable version of the MLA ("pre-2013 MLA") does not authorize a private right of action.[3]   It is undisputed that the pre-2013 MLA does not expressly provide for a private right of action; the remaining question is whether the pre-2013 MLA implicitly authorizes a private right of action.   This question is inextricably intertwined with the question whether there are common issues of law for class adjudication, so the Court finds it appropriate to address this issue now.   This issue appears to be a matter of first impression in this Circuit.   In fact, the parties did not

---

[3] Again, references and citations to the MLA are to the pre-2013 version of the statute unless otherwise noted.  *See supra* note 1.

cite, and the Court has not located, any authority from any Court of Appeals or District Court specifically addressing whether the pre-2013 MLA authorizes a private right of action.

      1.   *Private Right of Action Jurisprudence*

A private right of action "to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The issue of whether a statute creates by implication a private right of action is a "question of statutory construction." *Love v. Delta Air Lines*, 310 F.3d 1347, 1351 (11th Cir. 2002) (internal quotation marks omitted). The court must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. "Statutory intent . . . is determinative." *Id.* "Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286-87. "Congressional intent to create a private right of action will not be presumed. There must be clear evidence of Congress's intent to create a cause of action." *Love*, 310 F.3d at 1353 (internal quotation marks omitted).

To determine whether Congress intended to create a private right of action, the court first "look[s] to the statutory text for 'rights-creating' language." *Love*, 310 F.3d at 1352

(internal quotation marks omitted).  If the language explicitly confers a right directly on a class of persons or identifies "the class for whose especial benefit the statute was enacted," then such language militates in favor of finding an implied right of action.  *Id.* (internal quotation marks omitted); *accord Miller v. Chase Home Fin., LLC*, 677 F.3d 1113, 1116 (11th Cir. 2012) (per curiam).  Second, the court must "examine the statutory structure within which the provision in question is embedded."  *Love*, 310 F.3d at 1353.  "If that statutory structure provides a discernible enforcement mechanism, *Sandoval* teaches that [the courts] ought not imply a private right of action because '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'"  *Id.* (quoting *Sandoval*, 532 U.S. at 290).  Third, if "statutory text and structure have not conclusively resolved whether a private right of action should be implied, [the court] turn[s] to the legislative history and context within which a statute was passed."  *Id.* at 1353.

In *Sandoval*, the Supreme Court concluded that § 602 of Title VI of the Civil Rights Act of 1964 does not create a private right of action for disparate impact claims because § 602 contains an extensive administrative remedial scheme and focuses "neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that

will do the regulating." 532 U.S. at 289-91. Similarly, the Eleventh Circuit found in *Love* that the Air Carrier Access Act does not create a private right of action for individuals alleging violations of its provisions, in part because the statute established an administrative enforcement regime. *Love*, 310 F.3d at 1357-60; *accord Miller*, 677 F.3d at 1116 (finding that Home Affordable Modification Program and Emergency Economic Stabilization Act did not create a private right of action for homeowners, partly because Congress "gave the Secretary [of the Treasury] the right to initiate a cause of action, via the Administrative Procedure Act").

2.   *The MLA: Purpose, Rights, and Remedies*

Using this analytical framework, the Court examines the purpose, rights and remedies associated with the pre-2013 MLA. In 2006, the U.S. Department of Defense issued a report on "predatory lending" to Congress. U.S. Dep't of Defense, Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (Aug. 9, 2006) [DoD Report], http://www.defense.gov/pubs/pdfs/Report_to_Congress_final.pdf (last visited Mar. 19, 2014). The report concluded that predatory lending to military personnel, including car title loans, "undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all-volunteer fighting force." *Id.* at 9. The Department of

Defense recommended prohibiting lenders from using "car title pawns as security for obligations." *Id.* at 7, 51.

In response to the DoD Report, Congress enacted the MLA. The MLA provides that a "creditor who extends consumer credit to a covered member of the armed forces" "may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended." 10 U.S.C. § 987(a)-(b) (2006). The MLA also makes it unlawful for a "creditor to extend consumer credit to a covered member . . . with respect to which" the creditor uses "the title of a vehicle as security for the obligation." *Id.* § 987(e)(5).

The pre-2013 MLA contains a "Penalties and Remedies" section. That section, which is still part of the current MLA, provides four penalties and remedies. First, creditors who knowingly violate the MLA are guilty of a misdemeanor. *Id.* § 987(f)(1). Second, "[t]he remedies and rights provided under this section are in addition to and do not preclude any remedy otherwise available under law to the person claiming relief under this section, including any award for consequential and punitive damages." *Id.* § 987(f)(2). Third, "[a]ny credit agreement, promissory note, or other contract prohibited under [the MLA] is void from the inception of such contract." *Id.* § 987(f)(3). And fourth, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be

enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made." *Id.* § 987(f)(4).

Although the pre-2013 MLA did not include an express civil remedy, the Court finds that Congress intended to create a private right of action.  First, as noted above, the pre-2013 MLA provides that "[a]ny credit agreement, promissory note, or other contract prohibited under [the MLA] is void from the inception of such contract." *Id.* § 987(f)(3).  The Supreme Court found a private right of action based on similar language in § 215 of the Investment Advisers Act of 1940.  *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979) ("By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere.").  Second, the pre-2013 MLA provides that arbitration clauses in contracts covered by the MLA are not enforceable against covered borrowers.  10 U.S.C. § 987(f)(4). Such a provision would not be necessary if there were no private right of action under the MLA.  Third, the pre-2013 MLA makes clear that the remedies and rights provided under the MLA "are in addition to and do not preclude any remedy otherwise available under law to the person claiming relief under this section, including any award for consequential and punitive damages." *Id.* § 987(f)(2).  Thus, Congress obviously intended

that a covered borrower could seek relief through litigation under the MLA. It is also significant that unlike the statutes in *Sandoval* and *Love*, the pre-2013 MLA does not establish an administrative enforcement regime. For all of these reasons, the Court finds that the pre-2013 MLA authorizes a private right of action, including a private right of action for damages.

The Court notes that this conclusion is consistent with the rationale of many district courts that have considered a similar provision in the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. app. § 501 *et seq.* The SCRA caps the amount of interest that may be charged on obligations incurred by servicemembers while they are on active duty. 50 U.S.C. app. § 527(a). Like the MLA, the SCRA does not provide an express civil remedy or an administrative enforcement regime for violations of the interest rate cap. It simply sets the cap. Several district courts have concluded that Congress intended to create a private remedy under § 527 because without it, the relief provided under that section would be "of no value at all." *Moll v. Ford Consumer Fin. Co.*, No. 97 C 5044, 1998 WL 142411, at *4 (N.D. Ill. Mar. 23, 1998) (internal quotation marks omitted) (evaluating 50 U.S.C. app. § 526 (2002), which is now codified as amended at 50 U.S.C. app. § 527). "That is, if no private cause of action is implied, creditors could simply ignore the mandate of § 52[7] and then claim that they cannot be held responsible. Congress

11

could not have intended such a result." *Id.*; *accord Frazier v. HSBC Mortg. Servs., Inc.*, No. 8:08-cv-02396-T-24 TGW, 2009 WL 4015574, at *3-*5 (M.D. Fla. Nov. 19, 2009) (finding private right of action under SCRA § 527); *Cathey v. First Republic Bank*, No. 00-2001-M, 2001 WL 36260354, at *6 (W.D. La. July 6, 2001) (noting that without a private right of action, banks could simply ignore the SCRA and "not worry about lowering the interest rates. If they could not be sued, why bother obeying the law?"). The persuasive rationale in these SCRA cases supports the Court's finding that a private right of action for damages exists under the MLA. The Court thus rejects this argument for denial of class certification, and Defendants' Motion for Partial Summary Judgment (ECF No. 139) is denied.[4]

### B.   Are Plaintiffs' Transactions Covered by the MLA?

The named Plaintiffs in this action entered into transactions in the states of Georgia and Alabama. Defendants argue that these claims fail as a matter of law because Defendants who entered these transactions are not "creditors" who extend "consumer credit" within the meaning of the MLA. Specifically, Defendants Georgia Auto Pawn, Inc. and Alabama Title Loans, Inc. represent that they are pawnbrokers operating

---

[4] Even if the specific type of remedy is not mentioned in the MLA, the Court knows of no reason why an unjust enrichment remedy could not be pursued given that the contracts that violate the MLA are deemed void from inception. Defendants' motion for summary judgment on this issue is also denied.

under state pawnshop statutes.  Defendants argue that the "pawn"
transactions are creatures of state law that do not involve
"credit" within the meaning of the MLA.  In support of this
argument, Defendants point out that: (1) the agreements refer to
each transaction as a "pawn transaction," (2) the agreements use
"pawn" language (pawnbroker not lender, pledgor not borrower),
(3) the customers had no obligation to pay because they had no
obligation to redeem their vehicle titles, and (4) the customers
did not face any personal liability in connection with the
transaction.  The Court previously rejected these arguments in
its denial of Defendants' motion to dismiss.  Defendants'
arguments are no more persuasive today than when the Court
thoroughly considered them at the motion to dismiss stage.
Nevertheless, the Court explains its rationale again, starting
with an examination of the applicable MLA provisions followed by
an analysis of the contract language.

    1.   *MLA Definitions*

Under the MLA, a "creditor who extends consumer credit to a
covered member of the armed forces or a dependent of such a
member . . . may not impose an annual percentage rate of
interest greater than 36 percent with respect to the consumer
credit."  10 U.S.C. § 987(a), (b).  The statute also provides
several limitations on creditors who extend consumer credit to

covered borrowers. *Id.* § 987(e).  The MLA preempts inconsistent state laws. *Id.* § 987(d).

The MLA does not define "creditor" or "consumer credit." Rather, the statute directed the Secretary of Defense to prescribe regulations establishing those definitions. *Id.* § 987(h)(2)(D), (3).  In the final rule adding new regulations to implement the provisions of the MLA, the Department of Defense stated that "vehicle title loans should be included within the definition of consumer credit, and that covering such transactions is consistent with the law's purpose."  Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 Fed. Reg. 50,580, 50,586 (Aug. 31, 2007).

The regulations contain the following definitions:

"Creditor" is "a person who is engaged in the business of extending consumer credit with respect to a consumer credit transaction covered by this part."  32 C.F.R. § 232.3(e) (2007). The term "'person' includes a natural person, organization, corporation, partnership, proprietorship, association, cooperation, estate, trust, and any other business entity and who otherwise meets the definition of 'creditor' for purposes of Regulation Z."[5]  *Id.*

---

[5] "Regulation Z" is a Truth in Lending regulation, 12 C.F.R. pt. 226.

"Credit" is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 232.3(d).

"Consumer credit" is "closed-end credit offered or extended to a covered borrower primarily for personal, family or household purposes" and includes "vehicle title loans," which are defined as "Closed-end credit with a term of 181 days or fewer that is secured by the title to a motor vehicle, that has been registered for use on public roads and owned by a covered borrower" other than a "credit transaction to finance the purchase or lease of a motor vehicle when the credit is secured by the vehicle being purchased or leased." *Id.* § 232.3(b)(1)(ii), (b)(2)(ii) (emphasis added).

"Closed-end credit" is defined as "credit other than 'open-end credit' as that term is defined in Regulation Z (Truth in Lending), 12 CFR part 226." *Id.* § 232.3(a). This definition of "closed-end credit" is identical to the definition of "closed-end credit" in Regulation Z, which defines "closed-end credit" as "consumer credit other than 'open-end credit' as defined in this section." 12 C.F.R. § 226.2(a)(10) (2011). "Open-end credit" is defined in Regulation Z as "consumer credit extended by a creditor under a plan in which: (i) The creditor reasonably contemplates repeated transactions; (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid

balance; and (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." *Id.* § 226.2(a)(20).

The Federal Reserve Board promulgated Official Staff Interpretations to Regulation Z and included "pawn transactions" as a type of closed-end credit transaction. 12 C.F.R. pt. 226, supp. I, subpt. C ¶ 17(c)(1)(18) (interpretation regarding 12 C.F.R. § 226.17(c)). "Pawn transactions" occur when, "in connection with an extension of credit, a consumer pledges or sells an item to a pawnbroker creditor in return for a sum of money and retains the right to redeem the item for a greater sum (the redemption price) within a specified period of time." *Id.* The Department of Defense specifically adopted the Federal Reserve Board's Official Staff Interpretations to Regulation Z. 32 C.F.R. § 232.3(i) ("Regulation Z means any of the rules, regulations, or interpretations thereof, issued by the Board of Governors of the Federal Reserve System to implement the Truth in Lending Act, as amended, from time to time, including any interpretation or approval issued by an official or employee duly authorized by the Board of Governors of the Federal Reserve System to issue such interpretations or approvals.").

In crafting the implementing regulations, the Department of Defense emphasized that its major concern was "the debt trap

some forms of credit can present for Service members and their families." The Department of Defense highlighted that "[t]he combination of little-to-no regard for the borrower's ability to repay the loan, unrealistic payment schedule, high fees, and interest and the opportunity to roll over the loan instead of repaying it, can create a cycle of debt for financially overburdened Service members and their families." 72 Fed. Reg. at at 50,582. The Department of Defense noted that vehicle title loans can lead to such a debt trap because they "are generally made for 30 days with high interest/fee structures (average of 295 Annual Percentage Rate (APR))" and because many states allow these loans to "be rolled over by the borrower several times if the borrower is unable to pay the principal and interest when due." *Id.* "If not paid or rolled over, many states allow the creditor to repossess the vehicle and in some states the borrower is not entitled to any portion of the proceeds of the vehicle sale." *Id.*

   2. *The Contract Language*

  The current record includes exemplar contracts for Alabama and Georgia, which Defendants contend are substantially similar to the contracts entered by the named Plaintiffs. *See* Defs.' Mot. for Summ. J. Ex. A, Fields Decl. Tab 1, ECF No. 184-3 at 9-21. The Alabama and Georgia documents do use the terms "pawn transaction," "pledgor," and "pawnbroker." *Id.* at CLA001414-16,

Ala. Exemplar Contract, ECF No. 184-3 at 10-12; *Id.* at CLA001152-54, Ga. Exemplar Contract, ECF No. 184-3 at 14-16.

But these agreements also include language typically associated with consumer loan transactions. They refer to the "cost of [the customer's] credit," the "dollar amount the credit will cost" the customer, and "amount of credit provided to" the customer.[6] Ala. Exemplar Contract at CLA001414; Ga. Exemplar Contract at CLA001152. The agreements state that the customers "are giving a security interest in the certificate of title" to the vehicle. Ala. Exemplar Contract at CLA001414; Ga. Exemplar Contract at CLA001152. The agreements authorize Defendants to register a lien on the certificate of title. Ala. Exemplar Contract at CLA001414; Ga. Exemplar Contract at CLA001152. Also, there is evidence that both Alabama and Georgia customers received notices from Defendants which stated that the customers' automobiles had "been pledged as security for the

---

[6] Defendants argue that the Court should not consider these disclosures, which are required under the Truth in Lending Act ("TILA"). Defendants do not dispute that the transactions are "closed-end credit" transactions within the meaning of TILA, but they contend that the MLA regulation did not adopt TILA's definition of "closed-end credit." Defendants made the same argument at the Motion to Dismiss stage, and the Court rejected it. *Cox v. Cmty. Loans of Am., Inc.*, No. 4:11-cv-177 (CDL), 2012 WL 773496, at *7-*8 (M.D. Ga. Mar. 8, 2012). As discussed above and in the Court's order denying Defendants' Motion to Dismiss, the Department of Defense *copied* Regulation Z's definition of "closed-end credit." The Official Staff Interpretation to Regulation Z—which was specifically adopted by the Department of Defense, *see* 32 C.F.R. § 232.3(i)—included "pawn transactions" as a type of closed-end credit transaction. 12 C.F.R. pt. 226, supp. I, subpt. C ¶ 17(c)(1)(18) (interpretation regarding 12 C.F.R. § 226.17(c)).

pawn," emphasized that a pawn "is a more expensive way of borrowing money," asked the customer to acknowledge that he had "borrowed" money from one of the Defendants, and asked the customer to acknowledge that "continued ownership" of the customer's vehicle would be "at risk" if the amount due was not paid. Am. Compl. Ex. C at 11, Reminder to Pledgor, ECF No. 18-1 at 24; Am. Compl. Ex. D at 4, Reminder to Pledgor, ECF No. 18-1 at 42.

Notwithstanding this consumer credit language in the agreements, Defendants argue that Plaintiffs did not take on "debt" because Plaintiffs did not incur any personal liability to repay the "money advanced." Instead, Defendants contend that Plaintiffs sold their vehicles to Defendants, reserving the right to repurchase the vehicle and to continue using the vehicle until the time for repurchase expired. Thus, under the applicable *state* law, these transactions are not deemed "loans."

The Court rejected that exact argument in denying Defendants' Motion to Dismiss. *Cox*, 2012 WL 773496, at *6-*8. The present record does not warrant reconsideration of this decision. If the MLA defined "consumer credit transaction" by deferring to state law definitions of those terms, then Defendants' argument would be more persuasive. But that is not how the MLA defines covered transactions, and significantly, the MLA preempts state law that is inconsistent with the MLA.  10

U.S.C. § 987(d).   Therefore, to the extent that Georgia or Alabama law conflicts with the MLA, the state law is preempted. It does not matter that Georgia and Alabama would categorize the transactions as "pawns" rather than "loans."   What matters is that, based on the present record, the named Plaintiffs deposited a vehicle title with a Defendant as security for the payment of a debt.  If a specific sum of money is not paid, then the Plaintiff loses the title to the car, as well as the car itself.   Even though these transactions may not be considered "credit" transactions under state law, the Court finds that they are "consumer credit" transactions within the meaning of the MLA.[7]  Accordingly, to the extent that Defendants seek summary judgment as to these claims, that motion is denied, and any corresponding argument that these claims are not suitable for class certification is rejected.

C.   Plaintiffs' RICO Claims

In addition to their claims under the MLA, Plaintiffs assert that Defendants' violation of the MLA gives rise to claims under RICO, and they seek to have those claims included

---

[7] Defendants repeat the argument they made at the Motion to Dismiss stage regarding the Rule of Lenity.   The Court previously rejected that argument because the record at the Motion to Dismiss stage showed that Defendants acknowledged that "pawn transactions" are a type of "closed-end credit transaction" within the meaning of the TILA.   *Cox*, 2012 WL 773496, at *7.   The present record likewise establishes that Defendants recognized that "pawn transactions" are a type of "closed-end credit transaction" within the meaning of the TILA, which has the same definition of "closed-end credit transaction" as the MLA.

in any class certification.  Defendants respond that Plaintiffs'
RICO claims should not be certified because they all fail as a
matter of law, and they move for summary judgment as to those
claims.  Plaintiffs' RICO claims are against Defendants Robert
I. Reich, Terry Fields, Community Loans, Alabama Title Loans,
and Georgia Auto Pawn.  Reich is the CEO and Fields is the CFO
of Community Loans, Alabama Title Loans, and Georgia Auto Pawn.
They manage and control the activities of those companies.
Plaintiffs assert that Alabama Title Loans and Georgia Auto Pawn
constitute an "enterprise" within the meaning of RICO and that
Community Loans, Reich, and Fields are "persons" who are
associated with the enterprise and participate in the conduct of
the enterprise's affairs through the collection of unlawful
debt.[8]  Plaintiffs assert RICO claims under each subsection of
18 U.S.C. § 1962.  Plaintiffs' RICO civil claims are asserted

---

[8]  Plaintiffs also contend that Defendants engaged in a pattern of
racketeering activity of mail and wire fraud.  "Mail fraud or wire
fraud occurs when a person (1) intentionally participates in a scheme
to defraud another of money or property and (2) uses the mails or
wires in furtherance of that scheme."  *Johnson Enters. of
Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1317 (11th Cir.
1998) (internal quotation marks omitted).  To have a scheme to
defraud, there must be "proof of a material misrepresentation, or the
omission or concealment of a material fact calculated to deceive
another out of money or property."  *United States v. Maxwell*, 579 F.3d
1282, 1299 (11th Cir. 2009).
     Plaintiffs contend that Defendants represented to Plaintiffs that
their title loan transactions and renewals were lawful and valid debts
even though the transactions violated the MLA.  Plaintiffs did not
point to any evidence that Defendants explicitly made representations
about whether the transactions complied with the MLA.  The Court
declines to conclude that implicit misrepresentation of a legal
conclusion constitutes fraud under the specific circumstances
presented here.

under 18 U.S.C. § 1964(c), which provides a cause of action to persons injured "by reason of" a defendant's alleged RICO violation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006) ("[A] plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury.").

      *1.   Claim Under 18 U.S.C. § 1962(a)*

18 U.S.C. § 1962(a) prohibits the use or investment of illegally derived income to acquire, establish, or operate an enterprise:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, . . . through collection of an unlawful debt in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The Eleventh Circuit has not addressed what a plaintiff must prove to establish a civil RICO claim under § 1962(a). The majority of courts that have considered the issue have adopted the investment rule: the plaintiff must show that he "was injured by the use or investment of racketeering income[, and r]einvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation." *Sybersound*

*Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008); *accord Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 896 (8th Cir. 1999); *see also, e.g., Vicom v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778-79 n.6 (7th Cir. 1994) (collecting cases which hold that (1) "injury caused by the predicate racketeering acts is inadequate" to state a claim under § 1962(a) and (2) "the mere reinvestment of the racketeering proceeds into a business activity is not sufficient for § 1962(a) standing"); *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990) ("[T]he essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income."). *But see Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839-40 (4th Cir. 1990) (rejecting "investment rule").  The Court will follow the majority rule.

Here, Plaintiffs contend that Defendants received income from the collection of unlawful debts, but they have not pointed to evidence that Defendants did anything other than reinvest the proceeds back into the enterprise.  And they have not presented evidence from which a reasonable jury could conclude that the investment of illegal income was the proximate cause of their injury.  Rather, they assert that they were injured by the predicate act—the allegedly unlawful collection of a debt.  For these reasons, Plaintiffs' § 1962(a) RICO claim fails, and Defendants' summary judgment motion is granted as to that claim.

2.   *Claim under 18 U.S.C. § 1962(b)*

Under 18 U.S.C. § 1962(b), it is "unlawful for any person . . . through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Plaintiffs did not respond to Defendants' arguments regarding this claim, so the Court finds that Plaintiffs abandoned it. Plaintiffs also did not point to evidence that any of the Defendants acquired or controlled the alleged enterprise through collection of an unlawful debt; the undisputed evidence shows that ownership and control of Community Loans, Georgia Auto Pawn, and Alabama Title Loans has not changed since before implementation of the MLA. For these reasons, Plaintiffs' § 1962(b) RICO claim fails, and summary judgment is granted as to that claim.

3.   *Claim under 18 U.S.C. § 1962(c)*

Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt." Under this subsection, the enterprise is the vehicle through which the unlawful activity is committed. Section 1962(c) requires that the RICO "person" be "separate and

24

distinct" from the RICO "enterprise." *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1270 (11th Cir. 2000) (en banc). This "distinctness requirement" applies when the "singular person or entity is defined as both the person and the only entity comprising the enterprise." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000). "Under the 'non-identity' or 'distinctness' requirement, a corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members. An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself." *Davis v. Mut. Life Ins. Co. of N.Y.*, 6. F.3d 367, 367 (6th Cir. 1993) (cited with approval in *Goldin*, 219 F.3d at 1276). "RICO forbids the imposition of liability where the enterprise is nothing more than a subdivision or a part of the person." *Goldin*, 219 F.3d at 1276.

Plaintiffs assert that Reich and Fields, who are officers of Community Loans and its wholly-owned subsidiaries, Alabama Title Loans and Georgia Auto Pawn, directed and controlled the operations of the three companies. Plaintiffs further assert that Community Loans, Alabama Title Loans, and Georgia Auto Pawn engaged in the collection of unlawful debts when they collected on transactions that violated the MLA. The question for the

Court is whether each corporation and individual can be considered a "person" under § 1962(c) while also being considered jointly as the enterprise.

The Eleventh Circuit has not decided whether a corporation that engages in the collection of unlawful debts (or a pattern of racketeering activity) through an enterprise comprised only of itself, its employees, and its wholly-owned subsidiaries is sufficiently distinct from its subsidiaries and employees to satisfy the § 1962(c) distinctiveness requirement. *Goldin*, 219 F.3d at 1276 n.7. The Eighth Circuit concluded that a subsidiary is not "sufficiently distinct" from its parent for purposes of the § 1962(c) distinctiveness requirement. *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 898 (8th Cir. 1999). Likewise, the Seventh Circuit found that related business entities cannot serve as both the person and the enterprise: "A parent and its wholly owned subsidiaries no more have sufficient distinctness to trigger RICO liability than to trigger liability for conspiring in violation of the Sherman Act, unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity[.]" *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 934 (7th Cir. 2003) (citations omitted) (finding that RICO claim failed "because the enterprise alleged to have been conducted through a pattern of racketeering activity . . . is a wholly owned

subsidiary of the alleged racketeer"); *see also Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir. 1999) ("A firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself.").

Plaintiffs assert that the "enterprise" here is comprised of two subsidiaries of Community Loans: Georgia Auto Pawn and Alabama Title Loans.  Plaintiffs argue that when Georgia Auto Pawn and Alabama Title Loans collected on transactions that violated the MLA, they engaged in the collection of unlawful debts within the meaning of RICO.  Plaintiffs contend that Community Loans and its employees, Reich and Fields (who are also officers of Georgia Auto Pawn and Alabama Title Loans) directed and controlled the operations of the enterprise (Georgia Auto Pawn and Alabama Title Loans).  Plaintiffs directed the Court to no authority supporting the conclusion that the "enterprise" here (the two subsidiaries) is sufficiently distinct from the "persons" (Community Loans and its employees) such that a RICO claim can be maintained under § 1962(c).  Where related entities act "within the scope of a single corporate structure, guided by a single corporate consciousness," it "would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated." *Goldin*, 219 F.3d at 1276 (internal quotation marks omitted);

*accord Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1367 (M.D. Fla. 2005) (finding that corporation that associated with its employees and subsidiaries did not satisfy § 1962(c)'s distinctness requirement). As discussed above, the courts that have considered the issue concluded that a parent company which conducts business through an enterprise comprised only of the parent company's wholly-owned subsidiaries is not sufficiently separate from the enterprise for purposes of § 1962(c)'s distinctness requirement. *Bucklew*, 329 F.3d at 934; *Lockheed Martin Corp.*, 357 F. Supp. 2d at 1367. Likewise, employees of that parent company who make business decisions relating to the enterprise on behalf of the parent company are not sufficiently separate from the enterprise for purposes of section 1962(c). For these reasons, Plaintiffs' § 1962(c) RICO claim fails, and summary judgment is granted as to that claim.

     4.  *Claim under 18 U.S.C. § 1962(d)*

Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Given that the Court has found that Plaintiffs' claims under § 1962(a)-(c) fail, Plaintiffs' RICO conspiracy claim also fails, and Defendants' motion for summary judgment is granted as to that claim.

## II.  **Plaintiffs' Motions for Class Certification**

Based upon the preceding rulings, Plaintiffs' claims under the MLA survive while Plaintiffs' RICO claims fail.  Therefore, the Court next decides whether Plaintiffs' MLA claims satisfy the class certification requirements of Rule 23.  Plaintiffs seek certification of a class of "[a]ll covered members of the armed services and their dependents who, while a Covered Borrower, entered into a vehicle title loan by any means with Defendants in violation of the Military Lending Act . . . from October 1, 2007 to January 2, 2013."  Pls.' Supplemental Br. in Supp. of Class Certification 2, ECF No. 191.  Plaintiffs propose that the class be divided into the following subclasses:

   1.  Covered Borrowers who entered a transaction for which Defendants did not obtain a Covered Borrower Identification Statement prior to entering into the transactions;

   2.  Covered Borrowers who entered a transaction for which Defendants obtained a Covered Borrower Identification Statement after November 11, 2011 in Georgia, Alabama and Puerto Rico; and

   3.  Covered Borrowers who entered a transaction in which there is documentation contained in the loan file reflecting that the applicant was a Covered Borrower.

*Id.*  Plaintiffs propose excluding from the class "anyone who executed a [Covered Borrower Identification Statement] denying their membership as or affiliation with a" member of the military "whose loan file does not contain any documentation reflecting that the applicant is a covered borrower."  *Id.*

Plaintiffs initially sought certification only as to their MLA claims (Counts II and VI) under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs later filed a motion to amend their Complaint to pursue their MLA and RICO claims under Rule 23(b)(3). The Court first addresses whether the action should be certified under Rule 23(b)(2) and then addresses whether the action should be certified under Rule 23(b)(3).

### A.   Plaintiffs' Motion for 23(b)(2) Class Certification

Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(2), which permits a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs contend that Defendants collected excessive interest from all class members in violation of the MLA. Plaintiffs seek rescission of the contracts, as well as a return of all interest and principal they paid to Defendants.

Generally, claims for monetary relief may not be certified under Federal Rule of Civil Procedure 23(b)(2). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* Rule 23(b)(2) "does not authorize class certification when each

individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*

*Dukes* left open the question whether a Rule 23(b)(2) class may assert monetary claims that are merely incidental to injunctive or declaratory relief. *Id.* But *Dukes* made it clear that monetary claims are not merely incidental simply because they do not predominate over requests for injunctive and declaratory relief. *Dukes*, 131 S. Ct. at 2559. And the Supreme Court emphasized that Rule 23(b)(2) is not the proper vehicle for class claims involving "individualized award[s] of monetary damages." *Id.* at 2557. That is because a Rule 23(b)(2) class is mandatory, with no opportunity for class members to opt out; the relief sought under Rule 23(b)(2) must affect the entire class at once. *Id.* at 2558.

Here, the damages Plaintiffs seek would flow from a declaration that the contracts they signed are void from the inception. But the damages sought here are not merely incidental to declaratory relief of an indivisible injunction that benefits all class members. Rather, the damages sought are individualized claims for money, which, according to the Supreme Court, "belong in Rule 23(b)(3)" and not Rule 23(b)(2). *Id.* at

2558.  Each class member would be entitled to a different amount of damages, depending on the amount of interest paid and the amount of the loan.  For these reasons, the Court finds that this action cannot be certified as a class action pursuant to Rule 23(b)(2).

B.   Plaintiffs' Motion for 23(b)(3) Certification

The next question is whether the class may be certified under Federal Rule of Civil Procedure 23(b)(3).  The Court must first determine whether Plaintiffs should be permitted to amend the Complaint a third time to assert claims under Rule 23(b)(3).[9] Plaintiffs initially sought certification under Rule 23(b)(2) only.  Plaintiffs did not seek to add the Rule 23(b)(3) theory until after the Court held a hearing on their motion for class certification.

The Court finds that good cause exists to permit Plaintiffs to amend their complaint.  First, no one contends that additional discovery is necessary to support or oppose class certification under Rule 23(b)(3).  Whether a Rule 23(b)(3) class should be certified can be decided based on the current record.  Second, Defendants have been aware since the beginning of this litigation that Plaintiffs seek to recover interest

---

[9] The Court permitted Plaintiffs to file their Second Amended Complaint in 2012 under Federal Rule of Civil Procedure 15(a)(2).  The amended scheduling/discovering order entered after Plaintiffs' Second Amended Complaint does not specifically address amendments to the pleadings. Am. Scheduling/Disc. Order, ECF No. 101.

which they contend was unlawfully charged and collected by
Defendants.   While the procedural rule under which Plaintiffs
seek this recovery may have changed, the substance of
Plaintiffs' claims remains exactly the same.   Plaintiffs' motion
to amend the Complaint (ECF No. 190) is granted.   The Court must
now determine whether and to what extent certification is
appropriate under Rule 23(b)(3).

"Before a district court may grant a motion for class
certification, a plaintiff seeking to represent a proposed class
must establish that the proposed class is adequately defined and
clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d
1302, 1304 (11th Cir. 2012) (internal quotation marks omitted).
"If the plaintiff's proposed class is adequately defined and
clearly ascertainable, the plaintiff must then establish the
four requirements listed in Federal Rule of Civil Procedure
23(a)"—"numerosity, commonality, typicality, and adequacy of
representation." *Id.* (internal quotation marks omitted.
Finally, the plaintiffs must "establish that the proposed class
satisfies at least one of the three requirements listed in Rule
23(b)." *Id.* Rule 23(b)(3) "permits class certification if 'the
court finds that the questions of law or fact common to class
members *predominate* over any questions affecting only individual
members, and that a class action is superior to other available

methods   for   fairly   and   efficiently   adjudicating   the
controversy.'"   *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

      1.   *Adequacy of Plaintiffs' Class Definition*

      Defendants argue that the proposed class is not adequately
defined because Plaintiffs propose a "fail-safe" class that
turns on the legal conclusion of whether a transaction violated
the MLA.   A "fail-safe" class exists if the class "is defined in
a way that precludes membership unless the liability of the
defendant is established."   *Kamar v. RadioShack Corp.*, 375 F.
App'x 734, 736 (9th Cir. 2010); *accord Randleman v. Fidelity
Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)
(explaining the flaw in an improper fail-safe class: "Either the
class members win or, by virtue of losing, they are not in the
class and, therefore, not bound by the judgment").   Though this
issue has not specifically been addressed in the Eleventh
Circuit, courts in other circuits have concluded that a "'fail-
safe' class should not be certified because it is unfair to
defendants, it prevents an adverse judgment being entered
against plaintiffs, and it is unmanageable because the members
of the class could only be known after a determination of
liability."   *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y.
2012).   The Court may, however, "redefine the class to bring it
within the scope of Rule 23."   *Id.*

Based on the parties' extensive filings in this case and hearings that the Court has conducted, there is little mystery about who Plaintiffs seek to include in the proposed class. To the extent that Plaintiffs' definition of the class may be construed as an impermissible "fail-safe" class, the Court finds it appropriate to clarify the definition of the class. The Court understands this clarification is consistent with the Plaintiffs' proposed class definition. The Court understands that Plaintiffs propose the following class:

> All covered members of the armed services and their dependents who, between October 1, 2007 and January 2, 2013, entered into, rolled over, renewed, refinanced, or consolidated a vehicle title loan by any means with a Defendant that imposed an annual percentage rate of greater than 36 percent and required the title of a vehicle as security for the obligation for a term of 181 days or less. For purposes of this class definition, a covered member of the armed services is a member of the armed forces who is (A) on active duty under a call or order that does not specify a period of 30 days or less; or (B) on active Guard and Reserve Duty. A dependent of a covered member means the covered member's spouse, child, or an individual for whom the member provided more than one-half of the individual's support for 180 days immediately preceding the extension of consumer credit. For purposes of this class definition, the phrase "vehicle title loan by any means" includes vehicle title loans, vehicle title pawns, and vehicle title pledges.

The Court finds that this definition adequately defines the class.

2.   *Putative Plaintiffs Who Executed a Negative CBIS*

As previously noted, Plaintiffs propose subclasses that depend on whether the borrower executed a "covered borrower identification statement" indicating no affiliation with the military and whether Defendants otherwise had knowledge of that affiliation.  Plaintiffs maintain that even if a borrower denies any affiliation with the military, that borrower should be included in the class if evidence exists that Defendants nevertheless knew that the borrower was affiliated with the military.  For the reasons explained below, the Court finds that the class cannot include such individuals.

The MLA penalizes creditors who *knowingly* violate the MLA. 10 U.S.C. § 987(f).  Under the MLA's implementing regulations, the MLA does not apply to a consumer credit transaction if the applicant signs a "'covered borrower identification statement' . . . indicating that he or she is not a covered borrower" and the "creditor has not determined, pursuant to the optional verification procedures . . . that any such applicant is a covered borrower."  32 C.F.R. § 232.5(a)(1)-(2) (2007).  Based on this "safe harbor" provision, Defendants asked potential customers to complete a Covered Borrower Information Statement ("CBIS").  Defendants continued to make title loans to customers who executed a negative CBIS—meaning that the customer denied being an active duty servicemember or a dependent of an active

duty servicemember.  Defendants declined to make title loans to individuals who self-identified as covered borrowers by executing a positive CBIS.

Two of Plaintiffs' proposed subclasses are comprised of individuals who executed a negative CBIS.  Plaintiffs contend that those individuals, who told Defendants that they were not covered borrowers, should be included in the class if there is documentation in their loan files that reflects an affiliation with the military.  Plaintiffs acknowledge that there are "manageability concerns" associated with such potential plaintiffs.  Pls.' Supplemental Br. in Supp. of Class Certification 18, ECF No. 191.

The Court finds that even if the four Rule 23(a) requirements are met for the putative plaintiffs who executed a negative CBIS but who had conflicting information in their files regarding their military affiliation, the predominance requirement of Rule 23(b)(3) is not met.  Common issues of fact and law predominate if they have "a *direct impact* on every class member's effort to establish liability *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member."  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (internal quotation marks omitted).  "If after adjudication of the classwide issues, plaintiffs must still

introduce a great deal of individualized proof or argue a number
of individualized legal points to establish most or all of the
elements of their individual claims, [their] claims are not
suitable for class certification under Rule 23(b)(3)."   *Id.*
(alteration in original) (internal quotation marks omitted).
"[I]f the defendant has non-frivolous defenses to liability that
are unique to individual class members, any common questions may
well be submerged by individual ones."   *Id.*

Here, Plaintiffs seek to include in the class individuals
whose loan files contain conflicting information.   On one hand,
the loan files contain a negative CBIS, which means that the
individual denied being a covered borrower.   On the other hand,
the loan files contain documentation suggesting that the
individual may be a member of the military or have an
affiliation with a member of the military.   In light of the
conflicting information, it would be necessary to determine for
each potential Plaintiff whether the Defendant may rely on the
CBIS safe harbor.   In other words, a factfinder must decide
whether the Defendant knew that the individual was a covered
borrower and entered the transaction anyway.   This issue must be
resolved on a person-by-person basis, considering the borrower's
duty status at the time of the transaction as well as when and
under what circumstances the Defendant received documentation
suggesting a military affiliation.   Based on these significant

individualized   determinations,   the   Court   finds   that   Rule
23(b)(3)'s   predominance   requirement   is   not   met   for   putative
plaintiffs   who   executed   a   negative   CBIS.     Therefore,   the   Court
declines   to   certify   a   class   that   includes   these   individuals.
This   ruling   does   not   mean   that   the   individuals   may   not   bring   MLA
claims   individually   against   Defendants;   it   simply   means   that
they   cannot   proceed   as   part   of   a   class.     The   Court   notes   that
this   ruling   does   not   exclude   borrowers   who   entered   more   than   one
vehicle   title   loan   with   Defendants   and   executed   a   negative   CBIS
in   connection   with   some   transactions   but   not   others.     Only   those
transactions   in   which   the   negative   CBIS   was   executed   would   be
excluded   from   the   class   litigation.

> ### 3. *Putative Plaintiffs who Entered Transactions with Alabama, Georgia, Puerto Rico, Mississippi, Tennessee and Texas Defendants*

Defendants   who   operate   in   Alabama,   Georgia,   Puerto   Rico,
Mississippi,   Tennessee,   and   Texas   assert   that   individuals   who
entered   transactions   in   these   jurisdictions   should   be   excluded
from   the   class   because   these   Defendants   are   not   "creditors"   who
extend   "consumer   credit"   within   the   meaning   of   the   MLA.     The
Court   has   previously   rejected   these   arguments   as   they   relate   to
Georgia   and   Alabama   transactions   engaged   in   by   the   named
Plaintiffs   in   this   action.   *See supra* Part I.B.   Consistent   with
that   ruling,   the   Court   rejects   Defendants'   contention   that

transactions from these other jurisdictions should be excluded from the class.

### a.   TITLE PAWN JURISDICTIONS

The Court has previously rejected Defendants' argument that consumers from "title pawn" jurisdictions are not covered under the MLA.  *See supra* Part I.B.  Therefore, persons who entered transactions in Georgia, Alabama, and Puerto Rico with Defendants Georgia Auto Pawn, Inc., Alabama Title Loans, Inc., and Puerto Rico Auto Loans, LLC shall not be excluded from the class.[10]

### b.   TITLE PLEDGE JURISDICTIONS

Defendants Mississippi Title Loans, Inc. and Tennessee Title Loans, Inc. represent that they operate under state "title pledge" laws.  Defendants contend that the "pledge" transactions do not involve consumer credit extended by creditors because (1) the customers had no obligation to pay because they had no obligation to redeem their vehicle titles, and (2) the customers did not face any personal liability in connection with the transaction.  *See* Miss. Code Ann. § 75-67-415(d) ("A title pledge lender. . . shall not . . . [m]ake any agreement requiring or allowing the personal liability of a pledgor.");

---

[10] As with the Georgia and Alabama exemplar contracts, the present record includes an exemplar contract for the Puerto Rico transactions, which Defendants represent is substantively identical to the Georgia and Alabama contracts.  The Court finds that the same rationale supporting application of the MLA to the Georgia and Alabama transactions applies to the Puerto Rico transactions.

Tenn. Code Ann. § 45-15-115(14) ("A title pledge lender shall not . . . [r]equire a pledgor to provide any additional guaranty as a condition of entering into a title pledge agreement."). Therefore, Defendants contend that consumers who entered into these "pledge" transactions should not be included in the class.

Like the "pawn" contracts, the "pledge" contracts refer to the "cost of [the customer's] credit," the "dollar amount the credit will cost" the customer, and "amount of credit provided to" the customer. Fields Decl. Tab 2 at CLA001301-02, Miss. Exemplar Contract, ECF No. 184-3 at 28-29; *Id.* at CLA001582-84, Tenn. Exemplar Contract, ECF No. 184-3 at 24-26. The agreements state that the customers "are giving a security interest" in the motor vehicle. Miss. Exemplar Contract at CLA001301; Tenn. Exemplar Contract at CLA001582. Unlike the "pawn" contracts, the "pledge" contracts explicitly refer to the transaction as a "loan." Miss. Exemplar Contract at CLA001301; Tenn. Exemplar Contract at CLA001582. The Tennessee Exemplar Contract further states that the customer "will be required to pay additional interest and fees if [he] renew[s] this loan rather than pay the debt in full when due." Tenn. Exemplar Contract at CLA001582.

Based on the present record, the Court finds that putative class members who entered a "pledge" transaction that is substantially similar to the Mississippi and Tennessee Exemplar Contracts entered a "vehicle title loan" within the meaning of

the MLA.  Those Plaintiffs entered a "loan" that was secured by the title to a motor vehicle.  If the "loan" is not repaid, then the Plaintiff loses the car title and the car.  Even if such non-recourse loans are not considered "credit" transactions under state law, the Court finds that these title loans are "consumer credit" transactions within the meaning of the MLA, and the "title pledge" putative class members should not be excluded from the class.

c.  TEXAS CAR TITLE LOANS

Defendant Texas Car Title and Payday Loan Services, Inc. represents that it is not a "creditor" within the meaning of the MLA but is a "credit access business" operating under Texas's consumer protection laws.  *See* Tex. Fin. Code Ann. §§ 393.001, 393.221(1).  Therefore, Texas Car Title contends that any claims against it arising from transactions in Texas should not be included in the class.  A credit access business "obtains for a consumer or assists a consumer in obtaining an extension of consumer credit in the form of a . . . motor vehicle title loan."  *Id.* § 393.221(1).

In support of their argument, Defendants point to an exemplar contract for Texas, which they contend is substantially similar to all contracts entered in Texas.  Fields Decl. Tab 3 at CLA001375-77, Tex. Exemplar Contract, ECF No. 184-3 at 32-34. In the exemplar contract, the "lender" is FC Texas Lending, LLC.

*Id.* at CLA001375.   The contract refers to a "CSO"—Texas Car Title—which is "the third-party credit services organization who arranged this loan and will issue a letter of credit to Lender to secure repayment of the loan." *Id.* The loan itself has an interest rate of 10% per annum, which is the cap set by Texas law. *Id.* But in return for its "loan arranging" services, Texas Car Title receives a CSO fee that far exceeds 36% per annum. *Id.* Loan payments, including the principal, interest, and finance charge, are to be made "in care of" Texas Car Title and not to the lender. *Id.* Texas Car Title may remind the borrower to make loan payments and may "withhold and retain" from the loan payments the CSO fee. *Id.* at CLA001376. Finally, Texas Car Title "may release Lender's loan proceeds draft by issuing its own CSO check(s)." *Id.*

In addition to the loan agreement, a Texas customer separately contracts with Texas Car Title "for credit services related to [the] loan." *Id.* The CSO fees paid to Texas Car Title are disclosed in the loan agreement as part of the Truth in Lending Act disclosures. *Id.* at CLA001375-76.

Plaintiffs acknowledge that Texas Car Title is not the "lender" in the transactions. Plaintiffs nonetheless contend that Texas Car Title is a creditor within the meaning of the MLA because "credit service charges" are treated the same as interest under the MLA. The MLA regulations state that a

43

creditor or an assignee "may not impose a [military annual percentage rate] greater than 36 percent in connection with an extension of consumer credit to a covered borrower." 32 C.F.R. § 232.4(b) (2007). A military annual percentage rate "is the cost of the consumer credit transaction expressed as an annual rate" and must be "calculated and disclosed following the rules used for calculating the Annual Percentage Rate (APR) for closed-end credit transactions under Regulation Z (Truth in Lending)." *Id.* § 232.3(h). The military annual percentage rate includes "credit service charges" "if they are financed, deducted from the proceeds of the consumer credit, or otherwise required to be paid as a condition of the credit." *Id.* § 232.3(h)(1)(i).

Under these regulations, the CSO Fee clearly falls within the definition of military annual percentage rate. The issue is whether Texas Car Title is a "creditor" within the meaning of the MLA. Texas Car Title argues that it is not a "creditor" under the MLA because it does not regularly extend consumer credit. Plaintiffs have pointed to evidence that suggests otherwise, including the following: Texas Car Title is authorized to issue the loan check to the borrower, loan payments must be made in care of Texas Car Title, and Texas Car Title is authorized to withhold the CSO fee from the loan payments. A reasonable factfinder could conclude that Texas Car

44

Title arranges the loan, cuts the loan check, collects the loan payments, and receives a credit service charge. Furthermore, Texas Car Title evidently believed that it could be considered a creditor within the meaning of Regulation Z: it made the required Truth in Lending disclosures in the Texas Exemplar Contract. For the foregoing reasons, the Court finds that the Texas putative class members should not be excluded from the class.[11]

### 4.   Summary

The Court finds that Plaintiffs may pursue their MLA claims as a class. To summarize, the class is ascertainable because the parties have determined a way to identify covered borrowers who entered a vehicle title loan transaction during the relevant timeframe. There is no suggestion that the numerosity requirement is not met. Questions of law and fact common to the class clearly predominate over individual issues. The claims of the representative parties are typical of the claims of the class, and there is no suggestion that they will not fairly and adequately protect the interests of the class. The class is easily manageable, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. For all of these reasons, the following class

---

[11] The Court does leave open the possibility that a subclass may be appropriate for these Texas claims.

meets the requirements of Rule 23(a) and Rule 23(b)(3) and is certified:

> All covered members of the armed services and their dependents who, between October 1, 2007 and January 2, 2013, entered into, rolled over, renewed, refinanced, or consolidated a vehicle title loan by any means with a Defendant that imposed an annual percentage rate of greater than 36 percent and required the title of a vehicle as security for the obligation for a term of 181 days or less. For purposes of this class definition, a covered member of the armed services is a member of the armed forces who is (A) on active duty under a call or order that does not specify a period of 30 days or less; or (B) on active Guard and Reserve Duty. A dependent of a covered member means the covered member's spouse, child, or an individual for whom the member provided more than one-half of the individual's support for 180 days immediately preceding the extension of consumer credit. For purposes of this class definition, the phrase "vehicle title loan by any means" includes vehicle title loans, vehicle title pawns, and vehicle title pledges, and the phrase "covered members" does not include individuals who executed a statement at the time of the transaction indicating that they were not affiliated with the military.

CONCLUSION

As discussed above, Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(3) and Plaintiffs' Motion to Amend (ECF Nos. 190 & 191) are granted to the extent set forth in this Order; Defendants' Motion for Partial Summary Judgment (ECF No. 139) is denied; Defendants' Motion for Partial Summary Judgment (ECF No. 184) is granted as to Plaintiffs' RICO claims but is otherwise denied to the extent that the remaining issues raised by that motion have been

addressed and ruled upon in this Order; and Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2) (ECF No. 113) is denied.

The Court has attempted to address in today's comprehensive Order the issues raised by Plaintiffs' Motion for Declaratory and Injunctive Relief (ECF No. 180) and the issues raised in Defendants' Motion for Summary Judgment (ECF No. 184) to the extent that those issues have not been made moot by other rulings in this Order.  Therefore, those motions shall be administratively terminated.

Within twenty-one days of the date of today's Order, the parties shall submit a proposed Amended Scheduling and Discovery Order that includes a timeline for class notice under Federal Rule of Civil Procedure 23(c)(2)(B) and a proposed schedule for any additional proceedings in this action.

IT IS SO ORDERED, this 24th day of March, 2014.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE